M. J. WICKS and WIFE *v.* J. P. CARUTHERS *et al.*

1. DEED OF TRUST. *Rights of Beneficiaries.* Where a trustee under a deed of trust on land made to secure three notes, one of which is held by a third party, sells to pay only two of the notes in the hands of a party who bids his debt on the land, and the trustee conveys to him, the effect is the purchaser buys subject to the rights of the third party with knowledge, and holds the land subject to the rights of the third party, and neither the purchaser nor the trustee are personally liable to such third party in the absence of fraud. But if the land is afterwards sold to an innocent purchaser for value, the purchaser at the trustee's sale is then personally liable to the third party holding the note.

2. CHANCERY PRACTICE. A court of equity will not attempt to compel a party to convey land unless he is a resident within the territorial jurisdiction of the court, although process was served on him while he was within the jurisdiction of the court.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

J. W. CLAPP for complainants.

HENRY CRAFT for defendants.

FREEMAN, J., delivered the opinion of the court.

The facts on which the solution of this case mainly depends are as follows: In 1870, C. S. Severson executed his three promissory notes to Malcolm McNiel, a resident of the State of Kentucky. Two of these notes were for $5,000 each, the other for $10,000. At the same time Severson executed a deed of trust

23—VOL. 13.

to secure the payment of said notes, (John P. Caruthers who was served with subpœna in Shelby county, being the trustee, but said, and shown to be a resident of Chicago, Illinois), authorizing a sale of the property therein conveyed in default of payment; said property consisted of a large tract of land and farm thereon in Coahoma and Bolivar counties, Mississippi. The first two notes were due in six and twelve months, and the last twenty-four months after date. Severson afterwards encumbered the land with another deed of trust, and probably other encumbrances had been fastened, or attempted to be fastened on it. Be this as it may, the land was sold under the junior deed of trust referred to, and purchased by M. J. Wicks. It is not denied that this purchase was subject to the prior encumbrance in favor of McNiel.

M. J. Wicks, after this entered into an agreement in writing with McNiel, the substance of which we copy, so far as it bears on the questions to be decided. After reciting the facts we have stated as to the notes and deed of trust, and purchase by Wicks of the land under the junior encumbrance, of Maynard, the trustee, in favor of Hill, Fontaine & Co. by Wicks, it is added "and wishes to avail himself of any benefit to be derived from the lien under the deed of trust to said Caruthers for the benefit of said McNiel. Now, therefore, this agreement witnesseth, that in consideration of the transfer and assignment by the said McNiel to said Wicks of the notes of said Severson above mentioned, and the lien of the

said deed of trust, in the manner hereinafter stated, the said Wicks agrees and binds himself to become the purchaser of said notes without trouble, delay or expense to said McNiel as follows: That is, that he will on 27th day of April, 1873, pay to said McNiel or his order the amount that may then be due on the first note of Severson, with accruing interest at eight per cent. per annum, as stipulated in said notes, less the sum of one thousand dollars to be deducted as of date April 27, 1872; and on the 29th of December, 1873, he will pay to said McNiel or his order the amount then due on the second note of said Severson for $5,000, with interest as therein stipulated; and on 27th of December, 1874, he will pay in like manner the amount due on the last note, $10,000, with interest. He then further bound himself that Severson shall discharge a decree in the chancery court at Memphis, on a certain lot in said city, which had been conveyed by Severson and wife to McNiel. Then comes the stipulations of McNiel as follows: " In consideration of all which the said McNiel agrees and binds himself that he will not sell, transfer or dispose of the notes of said Severson above described to any other person than the said Wicks until after the lapse of thirty days from the time when the said Wicks is by the term of this agreement to pay to said McNiel the amount due upon the same respectively, and he will upon receiving from said Wicks the amount due upon said notes respectively as hereinafter stipulated, assign, transfer and set over to said Wicks each one of the said

notes at the time the amount due thereon shall be received from said Wicks, together with the lien se-cured by said deed of trust, but without personal recourse upon said McNiel, and when the *last* of said notes shall be assigned as above provided, the said McNiel will, so far as he can do so, substitute the said Wicks to all the rights and benefits secured to said McNiel by virtue of said deed of trust. But it is expressly understood and agreed that if the said Wicks shall fail to pay said McNiel the amounts due upon said notes respectively at the times herein above designated, or within thirty days thereafter, then the said McNiel may elect to consider this agreement as at *an end*, and may dispose of any or all of said notes, not before *then* assigned to said Wicks, as he may wish, or may proceed to enforce the provisions of said deed of trust for the purpose of collecting the amount then due on said notes."

It is then stipulated that Wicks shall pay taxes and do some other things, among which is to keep the title protected until the agreement is performed, " the said Wicks supposing the lien of said deed of trust to be now prior and paramount to all other." The notes were to be presented at a specified bank in Memphis as they fell due. The date is October 5, 1872. At the date of making this agreement there is no doubt that M. J. Wicks expected, and with good reason, to be able to meet his engagement to take up the notes. But owing to the suspension of the bank of which he was president, and proba-bly use of his private means to pay depositors when

the first note fell due, on 27th and 30th of April, he was unable to do so. He had left the city at that time, making no provision for its payment, and was expected to be absent for some time. McNiel seems to have been anxious to realize his money to meet his own engagements, and had relied on getting this money for the purpose. He sent his grandson as his agent to Memphis for the purpose of collecting the money on the Severson note, as assumed by Wicks. His, Wicks' wife, and his son, as we take it, a young man, but in business as partner of his father, says he was the agent of his mother, and was familiar with the facts in connection with the purchase of the land by his father, as well as the terms of the agreement between McNiel and him as to taking up the notes. When McNiel urged payment, and learned it had not been provided for, the son told him he would see if he could not make some arrangement by which he could get his money. He says his mother was entitled to, and had enough money in another bank to pay the note, the money deposited in the name of the husband. It had been derived, as he says, from a sale of land in Texas, conveyed by his father to his mother in consideration of the fact that he had as trustee of his wife used Memphis & Charleston Railroad stock of his wife, and this conveyance was to make this good. What were its terms we do not see, as the deed is not in the record. It might be a sinuous question on this statement of the facts as to whether this money, the result of sale of real estate, was the money of the

wife, nothing more appearing under the principle of the case of *Cox* v. *Scott,* Legal Rep., vol. 2, 119.

But as no such question is. made by the learned counsel, we pass this without deciding any thing either way on the point suggested.

The theory of complainant is, that the mother, under the advice of her son, purchased the note with this money, paying what it called for on its face, with accrued interest, the total being $5,275.50, and that as such purchaser she takes the note with the security of the deed of trust independent of the agreement between McNiel and M. J. Wicks, the husband.

It may have been that she and her son and agent so understood it at the time, but it is equally certain that Malcolm McNiel, the agent of the owner of the note, had no such understanding; on the contrary, it is clear he simply understood the note was being paid, and that the son had obtained the money for his father, and met his engagement. In this view we may say here that complainant's theory can receive no aid based on the idea of an assent or agreement on the part of McNiel that she was a purchaser simply of the note. It is beyond doubt that he had no knowledge of the fact that she was to be the owner of the note or have any rights in it in any way. The note was simply endorsed " without recourse on me or my heirs, Malcolm McNiel, by Malcolm McNiel, Jr., agent," he' refusing to endorse it in blank as requested, and endorsing ·it as directed by his grandfather. It now becomes necessary to state the case as presented by the pleadings.

When the second note became due default was made in paying it, and thereupon McNiel required Caruthers, the trustee, to advertise the land for sale to satisfy this and the last note, as provided in the agreement. Thereupon Mrs. Wicks and her husband filed the original bill to enjoin said sale.

This bill states the agreement or substance of it, and charges that the husband had been unable to comply with his agreement, and had abandoned it, and she had taken up the note with funds belonging to her in her individual right," and therefore she asserts the equity to have a beneficial interest to the extent of the note, and whatever interest McNiel had under said deed of trust before said note was paid to him passed to her. On this footing she prayed that Caruthers be restrained from selling the land without first providing for said note under a proper advertisement, etc.

This bill was demurred to on several grounds, among others, want of equity on its face, and the demurrer sustained, and bill ordered dismissed, with leave to file an amended bill.

In the meantime, when the bill was dismissed and injunction dissolved, the trustee proceeded to sell the land, when McNiel became the purchaser, bidding his debt, and perhaps costs, amounting to upwards of twenty-one thousand dollars, and took a deed from the trustee.

Soon after this McNiel died in Kentucky, leaving a will, which has never been probated here, in which this land is devised to parties assumed to be before

the court under an amended bill filed by Mrs. Wicks.
This amended bill goes on the theory and charges
the facts to be that complainant, S. A. Wicks, bought
the note as a simple investment, had never seen the
contract between her husband and McNiel, had noth-
ing to do with that contract, but had been advised
that she would acquire equal rights in proportion to
her debt under the deed of trust with McNiel, and
so be entitled to enforce the note as a charge on the
land.

It then charges that since the dissolution of the
injunction, the master had sold the land under the
deed of trust for the benefit of McNiel, not noticing
her rights, and McNiel had bought the land, and
had the trustee's deed. She charges that her rights
under the trust have not been impaired by this sale,
and the sale void as to her, but has delayed her in
the collection of her note, and was a fraud on her
rights. On this footing she claims that McNiel and
the trustee are personally liable to the payment of the
whole of complainant's debt, and she entitled to the
payment of the note out of proceeds of the land.
On this she asks a personal decree for the amount
of the note, payment also out of the proceeds, and
if the decree is not satisfied otherwise, then the sale
be declared void, and the court order a resale ac-
cording to the terms of the deed of trust for the
payment of the debt.

The chancellor held her entitled to a *pro rata*
share of the proceeds, gave a decree against an ad-
ministrator of McNiel, who had been appointed in

Tennessee, and brought into the case, and then declared that McNiel, by virtue of his purchase, held the lands as trustee, subject to the trusts created by the deed of trust, but reserved any further action on this, but referred to the clerk an inquiry as to whether McNiel made any disposition of the lands in his lifetime, or by will, and what property he had left, personal or real, within the jurisdiction of the court, with other matters not necessary to be noticed.

The Referees report that Mrs. Wicks is entitled to recover the entire amount of her note of McNiel personally or his representative, and also against Caruthers, the trustee, and also give her a lien on the land to be enforced, provided the parties necessary are within the jurisdiction of the court, a point reserved however, who are the present owners of the land, being one of the matters included in the reference ordered.

The land is shown to belong under the will of McNiel to three or four grandchildren, minors, and non-residents of the State of Tennessee, who have had publication made as to them, and an answer by guardian *ad litem.* As we have stated, J. P. Caruthers, the trustee, was served with process, it is true, in Shelby county, but by proof is shown to be a resident of Chicago, Illinois.

We have stated the position taken in the pleadings, and the facts of the case as shown by the proof. It is difficult to say from the amended bill, which is the case of complainant, what is the position of complainant. While a claim is made on the proceeds

of the sale, yet that sale is persistently claimed to be void, and the court asked to so decree it.

A personal decree is sought against McNiel and the trustee for making the sale, and if this does not satisfy the debt claimed, then a sale of the land is asked in accord with and under the deed of trust. How all this is to be reconciled and made consistent we are at a loss to see.

The chancellor has held in accord with these views as to the *pro rata,* and the Referees substantially affirm this decree, only modifying it so as to give a decree for the whole amount of the note instead of a *pro rata* part of price of land at sale. We need but say, that if a personal decree is to be had, and proceeds of land sale given complainant, it necessarily goes on the idea of an affirmance of the sale. McNiel and Caruthers can only be held liable for the money, on the ground that they have received the money of complainant to which she is entitled as money had to her use, or else on the ground that they had wrongfully deprived her of her assumed security under the deed of trust, and therefore must make good her loss. Complainants cannot assume and maintain contrary and antagonistic positions on such a question, and ask the proceeds of a sale, or personal decree, because it had been made, and at the same time treat the sale as void, and enforce rights as if never made. We will look at the case in both aspects suggested, on the theory that by the sale money or value has been received by McNiel rightfully belonging to complainint. Do the facts warrant

this view? It is simply the case, on the theory of complainant, where a trustee holding property subject to payment of three notes, one held by a third party, has sold to pay only two of the notes in the hands of one, and that one has bid his debt on the land, and the trustee has sold to him and conveyed. The only effect of this is, that if the third party, Mrs. Wicks in this case, has the rights of a beneficiary as claimed, which we do not decide, the purchaser has bought subject to them, with full knowledge of all the facts, and holds the land subject to her rights, but those rights are against the land, not against him personally. He has deprived her of nothing, as she was no party to the sale, only got a title encumbered by her debt, and so of the trustee. He seems to have acted in good faith—certainly no bad faith is shown on his part. The chancery court had dissolved the injunction restraining him from selling. He was free to act so far as Mrs. Wicks was concerned, and if he erred in his judgment as to her rights, he is not responsible for that, only for bad faith or fraud.

This act however, has not, if her contention is correct in the slightest degree, affected her rights under the deed, by virtue of her ownership of the paper. She has but to go to the State of Mississippi where the land lies, and file her bill or institute proper proceedings, and enforce whatever right she has acquired against the land. Nothing that has been done has impaired or weakened any right she claims by virtue of the ownership of the note secured by the deed of

trust.    The sale is not a decree of a court, binding
on all parties to it, and if it was, she was no party
to it.    If the land had been by McNiel sold to an
innocent purchaser for value, then there would be
grounds on which he might be charged personally, be-
cause this might deprive Mrs. Wicks of her security.
The principle of the case of *Coleman, etc.,* v. *Satter-
field,* 2 Head, 265, would sustain this relief in such
a case.    But no such case is made here, the pur-
chaser, McNiel, held the land until his death, it is now
in possession of his devisees.    There is nothing in the
way of complainant's enforcing her rights, if she has
them, against the land.    She cannot go on McNiel
and the trustee on this ground.    They have deprived
her of nothing.    If her theory is correct, McNiel has
only got a title, charged with her debt; that is all
of it, and so in one part of the bill it is maintained,
in fact nothing else is assumed.    If so, then he has
deprived her of nothing, and neither he nor the trustee
is personally liable to her.    We, however, distinctly
pretermit any expression of opinion on the facts of this
record, as to what rights Mrs. Wicks obtained by the
transfer of the note to her under the circumstances
under which it was received.

Assuming that whatever rights Mrs. Wicks has are
against the land—that she got no more by the transfer
is certain—McNiel refusing to endorse or transfer ex-
cept free from all personal liability, the question re-
mains, can this court enforce the right thus claimed,
even if sustained?    We take it, the land lying in
another State is beyond our control, and the parties

must be impleaded in that jurisdiction, when a charge on realty is to be enforced. It is a *quasi* proceeding *in rem.* against the land, and not against beneficiaries and trustees, who are necessary parties only to settle equities between them, in order to ascertainment of what the land is chargeable with, the land after all is alone to be charged and appropriated.

It is true the trustee is before the court by source of process of the court in fact in this case, but is out of the jurisdiction, but that does not give jurisdiction over the land, the subject-matter on which the charge is to be enforced, nor enable the court to compel the trustee to sell or convey. Our decree ordering him to sell, would only give authority in Tennessee, and be waste paper, as soon as he crossed the line of Mississippi, probably, but as he is out of this jurisdiction he cannot be so ordered. A mere declaration of right which we could not enforce, is what a court could not do, a decree which we have no jurisdiction to execute, would be *tristem fulmen* and a useless form not in accord with the course of judicial proceedings nor the dignity of such tribunals.

Courts of equity act *in personam* in most cases, where it has jurisdiction of the person, and compel parties to perform contracts for conveyance of lands in foreign countries, but the essential qualification of the rule is, "if the parties are resident within the territorial jurisdiction of the court: Sto. Eq. J., Ed. by Perry, sec. 743.

"So it seems," says same authority, section 744, "a court of equity has no jurisdiction to order a defend-

Wicks and Wife *v.* Caruthers.

ant to sell lands situate in a foreign jurisdiction, when the case would be otherwise within its power." It must have the power to give complete relief in such cases in the principle, which could not be done in this case, · the party purchasing could not be placed in possession: *Morris* v. *Reamington,* 1 Pars. Eq. Cases, 387; *Blount* v. *Blount,* 1 Hawks., 365. See also *Telegraph Company* v. *Railroad,* 8 Baxt., 61, citing Leading Cases in Equity, vol. 3, pp. 497, 498.

There is nothing in the contention as *res adjudicata* when demurrer was overruled by arbitration court. The decree simply overruled the demurrer and remanded for answer and further proceedings: *Rodgers* v. *De-Bell,* 6 Lea, 69.

The result is, the report of the Referees is set aside, the decree of the chancellor reversed and bill dismissed with costs. It may be added, without prejudice as to any assumed rights of Mrs. Wicks against the land, if any she has.